Nummelin v. Huneck, No. 38-2-03 Cacv (Teachout, J., Nov. 24, 2004)

[The text of this Vermont trial court opinion is unofficial. It has been reformatted from the original. The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]


**STATE OF VERMONT**
**CALEDONIA COUNTY, SS.**


JEFFREY NUMMELIN and MARC NUMMELIN     :

                                             :      Caledonia Superior Court

                                             :      Docket No. 38-2-03 Cacv

                                             :

                            v.

                                             :

                                             :

STEPHEN HUNECK and GWENDOLYN HUNECK, and :
STEVEN DAVIS                                  :


**FINDINGS OF FACT and CONCLUSIONS OF LAW**

**<u>Hearing on the Merits</u>**

      This matter came before the court on June 25 and August 26, 2004 for a final hearing on the merits of this case concerning real property interests. On October 22, 2003, prior to taking evidence, the court conducted a view of the subject premises.

      Plaintiffs seek a declaration of a right of way by necessity from a parcel they own to a public road, through properties owned by the Defendants, and seek to enjoin Defendants Huneck from interference with such right of way. Defendants Huneck claim damages for trespass.

      At both the view and final hearing, Plaintiff Jeffrey Nummelin was present and both Plaintiffs were represented by Robert R. Bent, Esq.; both Defendants Huneck were present and represented by David Rath, Esq.; and Defendant Steven Davis was present and represented himself.

      Based on the credible evidence, including a number of exhibits that were admitted into evidence, the Court makes the following Findings of Fact and Conclusions of Law.


**Findings of Fact**


1

Plaintiffs are a father and his 14 year old son. They are the owners of a 14 ½ acre parcel of land in the Town of St. Johnsbury that they purchased on July 23, 2002. It is landlocked.

It was created as a separate parcel in 1846 when McManus, who had owned a much larger farm from which he had made outconveyances, deeded it to Hallet. The remainder owned by McManus after the conveyance is referred to herein as the McManus Remaining Land. At the time of the conveyance, on April 14, 1846, McManus's property adjoined a town road that is now known as Town Highway 57.[1] The road access was at the southeast corner of the McManus Remaining Land. The lot deeded to Hallet was located along the west side of the McManus property, and did not have direct access to the town road. McManus did not deed an easement to Hallet to provide access to the town road.

A search of the land records of St. Johnsbury shows that no successors to the McManus Remaining Land deeded an access easement to Hallet or any successor owner of the Hallet lot, and Hallet did not own any adjoining land. No owner of the Hallet lot ever recorded in the land records any document attempting to give notice of or preserve a right of access.

The Hallet lot is rectangular in shape and is located at the crest of Saddleback Mountain. It is wooded and has rocky cliffs on parts of it, particularly along the eastern boundary which is one of the long sides and is on the downhill slope. The portions of the McManus Remaining Land located just below and near it have similar terrain. The land in the area becomes less rough and rocky as it descends to the east, although there are still rocky areas, as well as many wet spots. The former McManus Remaining Land and adjacent lands on the eastern slope of Saddleback Mountain have beautiful sweeping views of the Moose River and its valley below.

No evidence introduced shows that there was ever any structure on the Hallet lot. There is some evidence from which an inference might be made that the Hallet lot has been logged in the past, but there is no reliable evidence about any route of access used, or on what terms.

In 1954, Lloyd Davis acquired land consisting of the McManus Remaining Land and substantial additional adjacent lands to the north. He owned his holdings for over 40 years and was a gentleman farmer. He had a bulldozer and enjoyed taking his bulldozer out on the land and creating roads through his property. There is a web of old roads, mostly now somewhat overgrown but still visible, throughout the wooded and brushy parts of the former Davis farm. These roads avoid steep and rocky terrain. There is a trail that loops around through the Hallet lot that a friend of Mr. Davis's created for snowmobiling. Mr. Davis also used it for hunting, and others have used it for cross country skiing.

During Davis's ownership, Parks operated a working farm directly to the south of the Davis farm, and maintained a fence along the Parks/Davis boundary. Parks often used a road on

---

[1]See more specific findings on this point below.

the Davis farm that ran from TH 57 at the southeast corner of the Davis farm toward the west, near and roughly parallel to the southern boundary of the Davis farm, to access his fenceline for repair.

There is no reliable evidence that Hallet or any successor owner ever created or used any access road over any part of the McManus Remaining Land or any other land in the area to gain access to the Hallet lot. Plaintiffs introduced at trial evidence from which they ask the court to infer that an access road existed along the route used by Parks to fix his fence and led all the way to the Hallet lot. While it is possible that there was such use, as the slope in that location is not as steep as at other places and presents the fewest terrain problems, and there is evidence of the existence of a road at that location on aerial photos from the 1960's, there is a failure of proof that any owner in the Hallet-Nummelin chain created an access route along that road and used it to access the Hallet lot at any time from 1846 to the present.

The Hallet lot was owned by members of the Cohen family from 1954 to 2002. There is no reliable evidence of how or on what terms they used or accessed it.

Starting in approximately 1995, the Hunecks began buying land on the eastern slope of Saddleback Mountain. They first purchased the Parks farm, consisting of approximately 150 acres. Stephen Huneck is a world-famous artist, author, and illustrator whose artistry centers around themes relating to dogs. The Hunecks developed a plan to create a sanctuary on their property where people who love dogs could come and walk their dogs in a beautiful natural setting enhanced with artwork. In 1996 or 1997, Stephen Huneck articulated his vision for this use of the Huneck(Parks) property in a written Mission Statement.

Lloyd Davis died in 1997, and in 1998, the Hunecks bought the bulk of the Davis Farm from the Davis Estate, thereby enlarging their holdings by adding over 100 acres north of the Parks parcel. Steven Davis, son of Lloyd Davis, became the owner of the remainder of the Davis Farm, the southeast corner and the part with frontage on TH 57. In connection with their purchase, the Hunecks acquired an easement from TH 57 across the Steven Davis land to the lands the Hunecks acquired from the Davis Estate. After their purchase from the Davis Estate, the Hunecks owned the lands along the north, east, and south boundaries of the Hallet lot. All of the McManus Remaining Land as it existed in 1846 was owned by the Hunecks and Steven Davis.

The Hunecks undertook extensive development on the Parks land and opened it to the public. They created studios and workshops, built a gallery, and constructed a dog chapel to celebrate peoples' relationships with their dogs. They created walking trails by clearing old trails and laying down wood chips, and installed interesting artistic features along the trails. They named the area Dog Mountain.

The Hunecks also bought another large parcel, known as the Achilles lot, on the top and western slope of Saddleback Mountain, to the west of the Hallet lot. As a result, the Hunecks own a total of approximately 400 acres on the top of Saddleback Mountain and on both its

3

eastern and western  slopes.  Their lands surrounds the Hallet lot, and have scenic views across both the Moose and Passumpsic river valleys.

In the winter of 2001-2002, the Hunecks hired Michael Miller, an environmental consultant with a background in civil engineering, wildlife biology, and forestry, to do a review of their holdings, map existing trails, and recommend development of trails and other features on all lands in coordination with the project already begun on the Huneck(Parks) land.

The Hunecks planned to expand their project to encompass all the property they had purchased on the mountain.   Their plan includes developing walking trails throughout all of the lands they acquired, including those from the Davis Estate and the Achilles lot, using the old Davis roads to some degree, but supplementing them with others and enhancing the users' experience with sculptures and educational features about plant and animal life.  The wood Stephen Huneck uses for sculptures, wood picture frames, wood art furniture, and other artistic creations is taken from the forests on Huneck lands.  In keeping with the Mission Statement, the project is designed to be a large single work of art created in harmony with nature to provide for a spiritual experience to connect people with themselves and their dogs.  It has already captured attention on an international scale, and articles and television films have been made describing the project.  The Hunecks employ several people in their Dog Mountain project. Employees are engaged in cutting wood, laying trails, helping with sculpture and furniture making, and working in the buildings.

Michael Miller mapped all existing remnants of trails and roads on the Huneck lands and prepared a written report.  He made proposals for use of all of the land and its features in a manner that integrates it with the development on the Huneck(Parks) parcel.  Nearly all of the Dog Mountain development so far is on the former Parks property.  Trails have not yet been developed on the Davis and Achilles lots to any significant degree.

Jeffrey Nummelin and his wife have owned a residence in a subdivision called Rocky Ridge on the west side of Saddleback Mountain since the early 1990s, before the Hunecks bought the Parks farm.  Access to their residential lot is from a road on the west side of Saddleback Mountain far away from TH 57. Jeffrey Nummelin likes the outdoors, and has spent considerable time over the years in the surrounding woods and lands of Saddleback Mountain engaged in hiking, cross country skiing, mountain biking, and other recreational activities.  Several years ago he obtained permission from the Hunecks to use their lands for recreational purposes, with the exception of hunting.

After the Hunecks bought the Achilles lot, Jeffrey Nummelin heard logging, and discovered that the Hunecks' employees and/or contractors, who were logging the Achilles lot, were logging ash off the Hallet lot owned by the Cohens.  He contacted the Cohens who came to Vermont to investigate.  Jeffrey Nummelin offered to buy the Hallet lot.  When Stephen Huneck heard of this, he also approached the Cohens about buying the Hallet lot and also called Jeffrey Nummelin, seeking to buy the Hallet lot.  The Cohens decided to sell to Nummelin, and on July 23, 2002, the Cohens deeded the Hallet lot to Jeffrey and Marc Nummelin.  This resulted in the

4

Nummelins owning the landlocked Hallet lot, surrounded by the Davis and Achilles lands owned by the Hunecks.

At the time of the purchase, Jeffrey Nummelin misunderstood the boundaries. He believed that the residential lot he and his wife owned overlapped with the Hallet lot for about 200 feet. He based this on the location of a pin in the ground which he thought marked the southwest corner of the Hallet lot (which would have resulted in the 200 foot overlap). He learned shortly thereafter from a surveyor he hired that the boundary was not as he thought, and that the Nummelin residential lot in Rocky Ridge touches the Hallet lot at a single point only. There is no overlap in the boundaries of the two Nummelin parcels, which are under different ownership. The Nummelin residential lot, owned by Jeffrey Nummelin and his wife, shares a common boundary with the Huneck(Davis) land. The Hallet lot is owned by Jeffrey Nummelin and his son. They have no specific plans for future use or development at this time, except for possibly tapping sugar maples.

In November of 2002, Jeffrey Nummelin began logging on the Hallet lot. He took logs out onto his residential lot over a corner of the Huneck (Davis) land, and took down barbed wire and No Trespassing signs put up by the Hunecks along the common boundary. The Hunecks' employees replaced barbed wire fencing and No Trespassing signs. There were a few encounters in which Stephen Huneck or his employees confronted Jeffrey Nummelin about boundary encroachment. Jeffrey Nummelin testified at the hearing that there was a mutual informal agreement that each had permission to take logs out over a corner of each other's lots (Huneck to take logs from the Achilles lot across the corner of Nummelins' Hallet lot, and Nummelin to take logs from the Hallet lot across the corner of Hunecks's Davis lot). Although this might have been a logical and reasonable arrangement, no such agreement was explicitly made.

The Hunecks sent Nummelin a Notice Against Trespass. After that, Nummelin stopped using the corner of the Huneck (Davis) land. Fence viewers were called in, but no resolution was reached. The parties' lawyers became involved, survey work was done, and this case was filed in order to determine the parties' interests.

Nummelin seeks a declaration that Plaintiffs hold a right of way across the Huneck (Davis) and Steven Davis lands (i.e. McManus Remaining Land) implied as a matter of law based on necessity, and asks the court to fix the location of that right along the "southern route" (described below), which corresponds to the road Parks used to use to fix his fence, continuing to the Hallet lot, and to enjoin Defendants Huneck from interfering with the right.

The Hunecks dispute that Plaintiffs have proved that the McManus Remaining Land was served by a town road in 1846, and argue that therefore no right of way by necessity can be implied. They argue in the alternative that any such right that might formerly have existed was lost due to the failure of Plaintiffs' predecessors in title to preserve it in accordance with the terms of the Marketable Record Title Act. They further argue in the alternative that if the court determines that their lands are subject to a right of way by necessity, the court should fix its location along either the "northern route" (described below), which is not on the McManus

Remaining Land but is on other Huneck(Davis) land which they offer in substitution for the purpose, or the "middle route" (also described below), which is on the McManus Remaining Land. They also request that if the court establishes any right of access across their lands, the court limit the scope of use, and require requested conditions pertaining to use and the construction of any access road.

The Hunecks also assert a claim in trespass for the use of their land for taking out logs without permission, and seek damages for trespass and the cost of replacing the barbed wire fence.

Steven Davis does not dispute the Plaintiffs' claim to a right of access across his land. He requests that the location of any such right of way be fixed along the same route as the right of access held by the Hunecks. All parties appear to be in agreement that if the court fixes a location for a right of access of the Plaintiffs across Steven Davis's land, it should be at the same location as the Huneck easement.[2]

*Access of McManus farm to a town highway in 1846*
The Hunecks claim that the evidence does not show that at the time of the McManus-to-Hallet conveyance in 1846, the McManus farm had frontage on a public highway. Shane Clark, licensed surveyor, gave his opinion in testimony that the road that is shown on the 1858 Wallings Atlas as the road leading to the McManus farm was a town highway and the same town highway that is now known as TH 57, the one adjoining the Steven Davis property. He reached this opinion in reliance on town records, the 1858 Wallings Atlas, a town highway map from the 1940's, and his professional expertise as a surveyor, which includes reaching conclusions from records that are less than complete. He acknowledges that there is no key on the 1858 Wallings Atlas that specifically identifies the road he refers to as a town road, as opposed to a private road. He also acknowledges that there is no information about whether that road was a town road between 1846 (or before) and 1858.

Nonetheless, town records show that when McManus was originally deeded the property he owned, the conveyance did not include a conveyance of an easement for right of way purposes. There is sufficient evidence in the form of Shane Clark's opinion plus this evidence from which it is reasonable to infer and decide, by a preponderance of the evidence, that the McManus farm in 1846 had frontage on a town highway, and that it is shown on the 1858 Wallings Atlas in the same location as the present TH 57. Therefore, the court finds that in 1846, the McManus farm had frontage on a public road, that being the same as the present TH 57.

*The Southern Route*

---

[2]There was some indication that the Hunecks and Steven Davis have agreed that the location fixed by prior documents should be changed slightly, and that the Nummelins have no objection to such change, but this is not a matter that was litigated before the court.

6

This is the route Nummelin asks the court to establish as the location of a right of way by necessity. It is on the McManus Remaining Land. It is the least steep of the three routes discussed by the parties at the hearing. There is an existing woods road visible on the ground. A portion of this route was used by Parks to repair his fence line and by Lloyd Davis to get firewood. Other users, in recent years, have connected it to the south boundary of the Hallet lot for snowmobiling, hunting, and cross country skiing purposes. There are a few wet areas along this route, but not as many terrain problems as exist with the other alternatives.

The Hunecks vigorously oppose this location because it runs right through the middle of the holdings they have assembled for their Dog Mountain project. A road at this location constructed and used to access the Hallet lot would bisect the network of walking trails they have planned to extend throughout their adjoining project properties. They claim it would be disruptive to the experience they intend for users of Dog Mountain, as it would put a "machine in the garden" by introducing noisy motorized vehicle traffic where their users would otherwise walk with their dogs on peaceful trails to enjoy the beauty of nature and the artistic enhancements of the site. The Hunecks have already invested in the development of their project on the lands they purchased, including plans for expansion to the Davis and Achilles lots. The Hunecks are concerned that Nummelin use of an access road at this location would subject Dog Mountain visitors to unpleasantness resulting from friction between the parties. Stephen Huneck attributes to Jeffrey Nummelin hostility toward the Hunecks that he believes would be extended to users of Huneck lands. The preponderance of the evidence does not support such a finding.

*The Middle Route*

This is the route that the Hunecks propose as their second choice. It is the only other location that either party has proposed that is located on the McManus Remaining Land. The court followed the course of this route, as well as the other two, on the view. The terrain is rough--very steep and rocky. There is a rocky cliff all the way along the boundary between the McManus Remaining Land (now Huneck) land and the Hallet lot, making it very difficult to cross into the Hallet lot. Any construction of a road at this location would involve extensive construction costs, require significant changes to the topographical features of the land, and entail risk of environmental damage. Common sense suggests that a road at this location would be steep and dangerous unless significant construction costs were incurred, and the greater the cost to address safety concerns, the greater the disturbance of the land and risk of erosion.

*The Northern Route*

There is a woods road along this route that the Hunecks have used to access the Achilles lot for logging purposes. It runs alongside a brook for much of its length, and is on a slant between ledge on one side of the road, and the brook on the other. There are 3-5 places where the ledge would need to be dynamited to build a road. There are several wet spots created by springs on this route, the largest creating a pool about 30 feet wide at wet times of year. Approximately 11-12 culverts would need to be installed to improve this road. Construction of an improved road along this route would result in significant environmental impact on the mountainside. It is approximately 50% longer than the southern route, and thus would entail

7

greater construction cost, even without consideration of the extra costs associated with the ledge and large number of springs.

The Hunecks favor this route because it would run the access road around the north perimeter of the Huneck(Davis) lands and keep it away from the network of nature trails they have planned for the rest of their holdings. This route is not on the McManus Remaining Land , but the Hunecks consent to the Court establishing a Nummelin right of way at this location in substitution for a route that crosses the actual McManus Remaining Land. Nummelin opposes this location, both because it is not on the McManus Remaining Land owned by McManus at the time the Hallet lot was created, and because development of an access road on this route would entail significantly greater cost to the Nummelins than the cost of developing a road on the southern route.

*Scope and Conditions*
There is evidence that the historic width of easements in the area is 20 feet. The minimum width of a road that the town would accept as a public highway is 50 feet. The Hunecks ask the court to impose limitations on use, including a prohibition against use of ATVs and snowmobiles, and a prohibition against use when people are walking their dogs on Huneck land. They also request an order that any road construction be done according to specific construction standards they request, that the Hunecks are entitled to any commercial grade trees that are cut on the easement area, and that the Hunecks are entitled to use the easement in common with the Nummelins. Nummelin opposes special conditions.

*Hunecks' Trespass Claim*
The Hunecks claim damages for trespass as requested on Defendant's H. The Court finds that Jeffrey Nummelin trespassed on Huneck (Davis) property when he took out logs from the Hallet lot across the corner of Huneck (Davis) property to the Nummelin residential lot without permission. The Hunecks are therefore entitled to nominal damages for trespass. They are also entitled to compensation for actual damages.

Jeffrey Nummelin took down barbed wire fence and No Trespassing signs which the Hunecks had to replace. The cost consist of $31.35 in materials, and $160.00 in labor to replace the fence and signs. As to other claims, the wages paid to Hunecks' employees in investigating the trespass and monitoring the boundary line were the result of discretionary choices made by the Hunecks in how they use their employees' time, and not a direct consequence of the trespass. The same is true for claimed costs such as rental of an ATV to inspect the site.

*Defendant Hunecks' Motion for Costs*
The bench trial in this case was scheduled to begin on October 22, 2003. At that time, the Hunecks were the only Defendants. Prior to taking evidence, the Court determined that in the absence of Steven Davis as additional Defendant, the Court would not be able to give complete relief on Plaintiffs' request for a declaration of the location of a right of way all the way to TH 57. The Hunecks' attorney moved to dismiss, and the Plaintiffs' attorney moved to continue the hearing to allow for the addition of Steven Davis as a Defendant. The Plaintiffs'

8

motion was granted. The time on that date that had been scheduled for trial was used instead to take a view of the premises. Steven Davis was contacted and participated in the view, having waived his right to representation by an attorney on the view. He was later served with an Amended Petition and became a Defendant in the case.

Defendants Huneck filed a Motion for Costs for time their attorney spent in preparing for the trial on October 22, 2003, which did not occur due to the granting of Plaintiffs' motion for continuance, and additional related time. Defendants Huneck seek compensation at $155 per hour for 8 hours and 15 minutes of wasted preparation time, 3 hours on October 22nd due to Plaintiffs not having sufficient proof that day, 3 hours and 40 minutes of travel time plus overnight expenses, and 3 hours for preparing the Motion for Costs. Plaintiffs do not contest the reasonableness of the hourly rate, but object on the grounds that Defendants should have filed a motion to dismiss for failure to join a necessary party prior to the day of trial, and failure to do so was the cause of any waste.

This is not a situation where Defendants Huneck attorney was unfairly surprised by the development at the beginning of the trial that a continuance was needed in order to include an indispensable party. Both sides were familiar with the general circumstances, and knew that any right of way on Huneck lands would have to continue over lands of Steven Davis in order for the Court to be able to provide relief. Without Steven Davis joined as a party, the Court could not know whether he would have a basis for objecting to the location at which the Court might fix the entry of the right onto his land.

Plaintiffs' attorney argues that Defendants' counsel created the waste by not having previously filed a motion to dismiss for failure to join a necessary party. Defendant Hunecks' counsel argues that Plaintiffs should have been fully prepared to prove their claim in all respects on the scheduled day of trial. Both attorneys bear a measure of responsibility for the wasted effort in preparing for a trial that could not take place on October 22, 2003. Either of them could have prevented the loss. In addition, the effort was not all wasted as much progress was made on that day in clarifying the issues and conducting the view.

The Court finds that the Plaintiffs' counsel was equally responsible with Defendants' counsel for any wasted effort, but that any expenses related to travel and expenses were not wasted because of the taking of the view on October 22, 2003 and because other progress was made. Plaintiffs' equal share would be 4 1/8 hours of trial preparation time, 1 ½ hours of time due to Plaintiffs inability to present proof on October 22, 2003, and 1 ½ hours related to the necessity of preparing a Motion for Costs. The total is 7 1/8 hours, which at $155 per hour is $1,104.38.

## Conclusions of Law

*Whether Plaintiffs are entitled to a right of way by necessity*

Rights of way by necessity are implied as a matter of law, based on a public policy that all property should be available for productive use. *Traders, Inc. v. Bartholomew*, 142 Vt. 486, 491 (1983). They are implied where an owner with access to a public road subdivides, or a severance otherwise occurs, creating a parcel that is otherwise landlocked. *Id.* The court implies, from the circumstance of necessity, that the parties intended to provide a right of access to the conveyed parcel. Also see *Okemo Mountain, Inc. v. Town of Ludlow*, 171 Vt. 201, 206 (2000). They exist whether or not a route is physically laid out on the ground and used at the time of conveyance, as the right is implied for future as well as current use. The location of the right of way on the servient premises may be left to subsequent agreement. *Moore v. Center*, 124 Vt. 277, 280 (1964).

The facts show that McManus had access on a public road, and that he conveyed the Hallet lot to Hallet with no specific right of access, creating the Hallet lot as a landlocked parcel. Neither Hallet nor any successor ever had any deeded easement or other ownership interest in adjacent property which would have terminated the necessity for a right of access. Therefore, the basis for a way of necessity has not ceased. *Traders, Inc.* at 493. Plaintiffs are entitled to a right of access by necessity from their Hallet lot through the McManus Remaining Land.

*Whether the right of way by necessity has become unenforceable under the Marketable Title Act*

The Hunecks argue that any right that might formerly have existed has been lost due to the failure of Nummelin's predecessors in title to preserve the right. The Marketable Record Title Act extinguishes property interests not preserved in the land records from the time of the last recorded instrument forty or more years old, except for enumerated exceptions:

> Any person who holds an unbroken chain of title of record to any interest in real estate for forty years, shall at the end of that period be deemed to have a marketable record title to the interest, subject only to such claims to the interest and such defects of title as are not extinguished or barred under this chapter, and such interests, limitations or encumbrances as are inherent in the provisions and limitations contained in the muniments of which the chain of record title is formed which have been recorded during the forty-year period.

27 V.S.A. §601 (a). Successors in interest may claim the benefit of periods of holding by their predecessors, and any right not preserved by an exception may only be preserved by a written notice filed within the forty year period. 27 V.S.A. §603.

There are several exceptions, including an exception for easements created by deed. The statutej does not bar or extinguish an interest in:

> Any easement or interest in the nature of an easement, or any rights appurtenant thereto granted, excepted or reserved by a recorded instrument creating such easement or interest, including any rights for future use. . .

10

27 V.S.A. §604 (a)(7). A right of way of necessity qualifies as an exception because it is created by implication from the deed that created the landlocked parcel. *Willey v. Thwing*, 68 Vt. 128, 130 (1896).

Accordingly, the fact that no predecessor of the Nummelins in the chain of record title to the Hallet lot preserved the right of way by a written notice filed in the land records is immaterial; the right of way is an "interest in the nature of an easement" that was created by implication from the 1846 McManus-to-Hallet deed, and was preserved for the benefit of the owners of the Hallet lot by exception (7) of the Marketable Record Title Act. Plaintiffs are entitled to the right.

*Fixing the location of the right of way*

The owner of the servient estate has the first opportunity to designate the physical location of an undescribed right of way, "provided it is reasonably convenient for the use of the one having it." *Jenne v. Piper*, 69 Vt. 497, 498 (1897) If the servient owner waives the opportunity, then the dominant owner may select the location. *Id.*

Where there has been a significant passage of time without either owner selecting the location, the court, in the exercise of its equitable powers, must consider the uses of the property made during the intervening period. Neither owner is entitled to unilaterally select a location to the detriment of the other owner's development and use of property. Under such circumstances, the court is obliged to exercise its equitable powers and make the selection "according to the reasonable convenience of both parties"after balancing all pertinent factors. *Stevens v. MacRae*, 97 Vt. 76, 81-82 (1923) (context of passage of time after easement expressly created in deed, but without a description of the location).

*Does the court have the authority to fix the location on other land of the servient owner?*

The Hunecks ask the court to select the Northern Route in order to minimize the interference with their Dog Mountain project. The Northern Route is not on McManus Remaining Land. This request presents a case of first impression, requiring the court to determine whether or not it has the authority to select a location outside the McManus Remaining Land.

The opinion in *Traders, Inc.* suggests that the Court does not have such authority: "This way did not (nor can it ever) lie over the Bartholomews' southern parcel to the west of the 121 acres, for those lands were never held in common with the other three parcels." *Traders, Inc.*, 142 Vt. at 492 (citations omitted). The underlying basis of the doctrine of implication of an access easement by necessity is to give effect to the intent of the original parties based on a fair construction of the deed in light of public policy.

It would contravene equitable principles to choose a route off the McManus Remaining Land if it had the effect of shifting to the right of way holder costs in developing the right for use

11

that are unduly burdensome in comparison to the costs of an available route on the servient lands. On the other hand, if, after consideration of all factors, the Court concluded that it was the option that maximized both parties' opportunities to use their property interests to their fullest extent at reasonable cost, and the Hunecks consented, it might be considered. First, the Court is obliged to examine and weigh all factors involved in a balancing of the equities.

*Balancing of the equities*

Factors to consider that favor the Hunecks include the fact that there was no notice included in any deed in the chain of title for over 150 years that would have alerted the Hunecks or Davis as owners of the McManus Remaining Land that in making use of their own land, they should take into account the existence of a right of way benefitting the Hallet lot. Moreover, since there was no road laid out on the ground, there was no physical notice that a right of way existed. It was not unreasonable for the Hunecks, then, to develop a plan for use of the McManus Remaining Land that was integrated with their use of adjacent lands they assembled for the Dog Mountain project. Prior to learning of the Nummelins' claim, they reasonably invested in the work of Michael Miller toward such a purpose.

On the other hand, they have not yet invested in improvements on the McManus Remaining Land that are wholly inconsistent with the existence of an access road to the Hallet lot. For example, in *Stevens v. MacRae*, supra, the servient owner had spent time and money investing in an orchard on land that the dominant owner wanted to use for a road. Such a level of investment and use on the part of the Hunecks has not yet occurred in this case. In addition, while an access road to the Hallet lot through the Dog Mountain project is not desirable in terms of maximizing the goals of Dog Mountain, it does not defeat the goals, either. The Dog Mountain mission can still be fulfilled with the land used as a nature and art park with a road running through it and walking trails that cross the road at selected locations.

Moreover, the Hunecks purchased the Parks, Davis, and Achilles lots with knowledge that these lots surrounded the Hallet lot, which they did not own, and that access to the Hallet lot most likely existed at some location. Thus, they accepted a certain amount of risk that an access road would affect their plans.

Furthermore, the underpinning of the doctrine of easements implied by necessity is the intent of the original parties, which includes the implied agreement that the access route is located on the remaining land of the seller. Generally, in the absence of an express or implied provision for unilateral power to locate, the location of an easement cannot be moved without the consent of both parties. *In re Shantee Point*, 174 Vt. 248, 261 (2002). This militates against the Hunecks being able to designate an off-site location and unilaterally "consent" to it.

Finally, the Northern Route that the Hunecks advocate would subject the Nummelins to unduly burdensome cost. That route would require the Nummelins to bear unreasonable development costs, or be limited to a significant degree in the uses they could practically make

of the Hallet lot.  The Hunecks' second choice, the Middle Route, would require not only significant cost but substantial environmental damage, and is dangerous.  Because of its topography, this route cannot reasonably be implied from the 1846 deed.

The Nummelins ask the Court to select the Southern Route for the location of the right of way.  This request is supported by the topography of the land, as the Southern Route is the most accessible and the one that involves the least expense, distance, and environmental disruption.  Using the most accessible and least costly route is consistent with the public policy basis of the implied right, i.e., that the Hallet lot land should be available for productive use.  While the location of an implied right should also be consistent with maximizing the servient owner's productive use of land, it is noteworthy that the Southern Route is along the southern boundary of the parcel McManus retained as a result of the subdivision, and would have resulted in minimal interference with McManus's use of remaining land following the conveyance.

A factor disfavoring the Nummelins' request is that the Nummelins acquired the Hallet lot knowing it was landlocked and that their predecessors in title had not claimed the use of an access right of way that they maintained on the ground or conveyed through their chain of title.  The Nummelins voluntarily took the risk that owners of the McManus Remaining Land had no knowledge of any impediment to inconsistent uses, such as assembling adjoining parcels and making plans for development of a larger integrated parcel.

Taking all of these factors into account, the Court concludes that the equities strongly favor the Southern Route.  It is the only practical route that is located on the McManus Remaining Land.  Its use as an access road to the Hallet lot, while detracting to some degree from the Hunecks' Dog Mountain project, is not wholly inconsistent with it.  The Middle Route would be unreasonably costly and inhibit the productivity of Hallet land as well as result in environmental damage.  It would also run through the Dog Mountain park and trail system, and as between the two options on the McManus Remaining Land, the Southern Route is strongly favored for the reasons stated.

The Court declines to select the Northern Route.  While the Court has given it consideration rather than rejecting it out of hand as off the McManus Remaining Land, it would not be equitable to impose on the Nummelins the significant additional cost the Northern Route would require when a route is available on the McManus Remaining Land that is accessible, can be developed for use at reasonable cost, runs along the boundary of the original remaining land, and can be used consistently with the Hunecks' and Davis's uses of their servient estates.

*Scope and use*

The Hunecks ask the Court to restrict the scope of the Nummelins' use of the right of way.  It is an easement implied from the fact of necessity, and carries the same rights and responsibilities as any other easement.  Under *Traders, Inc.*, such a right is unrestricted as to use.  *Traders, Inc.* at 493-94.  The Court has no basis for limiting use to non-motorized vehicles, restricting the use of the right of way when Huneck invitees are walking dogs, or imposing

13

construction conditions that are more restrictive than those required by current applicable development regulations. There is a historical factual basis for restricting width to 20 feet. There is no basis to establish a 50 foot width, as an implied easement is not required to qualify to become a public highway.

As to the Hunecks' request that they be entitled to use any road in common with the Nummelins, such use is consistent with the law of easements, but any such use may not interfere with the Nummelins' use for right of access. *Traders, Inc.* at 494. Since the creation of the right did not result in an easement for exclusive use, there is no reason to deprive the Hunecks and Davis with non-interfering use of any roadway on the right of way. *Id.* To the extent that either the Hunecks or Davis use any developed road, they could be required to share proportionately in maintenance costs.

Both Jeffrey Nummelin and Stephen Huneck testified that it would be helpful for the Court to define specifically their respective rights with respect to the easement. The Court has done so to a limited extent in the preceding paragraphs. Beyond those general statements, their rights and responsibilities are those created by the law of easements. The fact that the easement was implied by the circumstance of necessity does not render it different in scope and function than other easements. Because there was no concrete plan for use presented by the evidence, the Court is unable to give a more detailed delineation of the parties' respective obligations.

An exception is the Hunecks' request that they are entitled to the use of any wood from trees cut down to improve the right of way. This is part of the property that Nummelins' predecessors permitted Hunecks' predecessors to allow to grow, and the Hunecks should not be deprived of the in-kind benefit of this growth. This request is granted.

*Motion for Costs*

The Motion is granted for the reasons stated, and Defendants Huneck are entitled to $1,104.38 in costs.

**Order**

Based on the foregoing Findings and Conclusions, IT IS HEREBY ORDERED:

1.      Plaintiffs' request for a declaration that they are entitled to a right of way by necessity over lands of Huneck and Davis along the Southern Route is *granted*. The costs of preparing a survey and recording it in the land records will be borne by Plaintiffs. Defendants are entitled to ownership and possession of any wood from trees Plaintiffs cut down to improve and/or maintain the right of way.

2.      Plaintiffs' petition for an injunction against the Hunecks for interference with their right of way is *granted*. Plaintiffs' attorney shall prepare an Injunction.

14

3.          Defendant Hunecks are entitled to judgment on their claim for trespass in the amount of One Hundred Dollars in nominal damages and $191.35 in compensatory damages.  Defendant Hunecks' attorney shall prepare a Judgment.

4.          Defendants' Motion for Costs is *granted*.  Defendants Huneck are entitled to $1,104.38 in costs.


Dated this 24th day of November, 2004.



                                        Hon. Mary Miles Teachout
                                        Superior Judge